**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| HYUN JU PARK, *Plaintiff-Appellant*, v. CITY AND COUNTY OF HONOLULU; STERLING NAKI; JOSHUA OMOSO, *Defendants-Appellees*. | No. 18-16692 D.C. No. 1:17-cv-00142-ACK-KSC OPINION |

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted October 22, 2019
Honolulu, Hawaii

Filed March 13, 2020

Before: Susan P. Graber, Milan D. Smith, Jr., and
Paul J. Watford, Circuit Judges.

Opinion by Judge Watford;
Partial Concurrence and Partial Dissent by
Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 against police officers and the City and County of Honolulu alleging that defendants violated plaintiff's substantive due process right to bodily integrity under the Fourteenth Amendment.

Plaintiff was shot while working as a bartender after an off-duty police officer attempted, while intoxicated, to load his already-loaded firearm, which accidentally discharged. Plaintiff alleged that the officer's reckless handling of his firearm exhibited deliberate indifference to her personal safety, and that two other off-duty police officers were liable for failing to intervene to stop the dangerous conduct. Plaintiff also alleged that Police Department policies or customs caused her injuries. Plaintiff settled her claims against the officer who shot her, and the district court granted the remaining defendants' motion to dismiss.

The panel first held that because the two off-duty officers at the scene did not act or purport to act in the performance of their official duties, they were not acting under color of state law. The panel therefore affirmed district court's dismissal of plaintiff's claims against the officers.

The panel affirmed the district court's dismissal of plaintiff's § 1983 claim against the County, brought

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). The panel rejected plaintiff's assertions that the County was liable because the Chief of Police failed to amend a Honolulu Police Department policy to prohibit officers from carrying firearms whenever they consumed alcohol in any amount. The panel also rejected plaintiff's assertion that the Chief of Police failed to implement mandatory whistleblowing policies, which would have rooted out a culture of silence. The panel concluded that plaintiff had not plausibly alleged that the Chief of Police had actual or constructive notice that his inaction would likely result in the deprivation of plaintiff's federally protected rights.

Concurring in part and dissenting in part, Judge M. Smith joined the majority opinion as applied to the two off-duty officers and agreed that the § 1983 claims against them should be dismissed for failure to plausibly allege that they were acting under color of law. However, Judge M. Smith respectfully disagreed with the majority's analysis of plaintiff's *Monell* claim against the County.

## COUNSEL

Eric A. Seitz (argued), Della A. Belatti, Gina Szeto-Wong, and Kevin A. Yolken, Honolulu, Hawaii, for Plaintiff-Appellant.

Robert M. Kohn (argued), Nicolette Winter, Traci R. Morita and Tracy S. Fukui, Deputies Corporation Counsel, Department of the Corporation Counsel, City and County of Honolulu, Honolulu, Hawaii, for Defendant-Appellee City and County of Honolulu.

Sterling Naki, Ewa Beach, Hawaii, pro se Defendant-Appellee.

Joshua Omoso, Honolulu, Hawaii,  pro se Defendant-Appellee.

**OPINION**

WATFORD, Circuit Judge:

Hyun Ju Park used to work as a bartender at a sports bar in Honolulu, Hawaii.  Late one night, while Park was working, three off-duty police officers employed by the Honolulu Police Department stopped at the bar for drinks. After consuming seven beers over the course of two hours, one of the officers, Anson Kimura, decided to inspect his personal revolver, which the department had authorized him to carry.  He apparently did so to ensure that it was loaded. The other two officers, Sterling Naki and Joshua Omoso, watched as their intoxicated colleague recklessly attempted to load his already-loaded firearm.  Kimura's revolver accidentally discharged, and a single bullet struck Park.  She suffered serious, life-threatening injuries as a result.

Park filed this action against the three officers and the City and County of Honolulu under 42 U.S.C. § 1983 and Hawaii state law.  In her second amended complaint—the operative complaint in this case—Park alleges that the defendants violated her substantive due process right to bodily integrity under the Fourteenth Amendment.  As to the individual officers, Park alleges that Kimura's reckless handling of his firearm exhibited deliberate indifference to her personal safety, and that Naki and Omoso are liable for failing to intervene to stop Kimura's dangerous conduct.

As a basis for establishing the County's liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Park alleges that two Honolulu Police Department policies or customs caused her injuries. First, Park alleges that, at the time of the incident, Honolulu Police Department Policy 2.38 required off-duty officers to carry a firearm at all times, except when an officer's "physical and/or mental processes are impaired because of consumption or use of alcohol." According to Park, this policy required Kimura to possess his firearm when he entered the bar to begin drinking, and prohibited him from carrying it only when he had consumed enough alcohol to render his physical or mental processes impaired—at which point he posed an immediate danger to anyone in his vicinity. Park contends that the policy was deficient for the further reason that it failed to instruct officers how to determine when they had become impaired and what to do with their firearms in the event of impairment.

Second, Park alleges that the Honolulu Police Department tacitly promoted a "brotherhood culture of silence" that condoned police misconduct and affirmatively discouraged officers from reporting their colleagues' transgressions. She asserts that this well-established custom within the department "emboldened" Kimura to act with impunity, even when doing so put others in danger.

Park settled her claims against Kimura early on, and he is no longer a party to these proceedings. The remaining defendants (Naki, Omoso, and the County) moved to dismiss Park's second amended complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted their motion as to the § 1983 claims and declined to exercise supplemental jurisdiction over Park's state-law claims. On appeal, Park urges us to reinstate her § 1983 claims.

I

We review *de novo* the dismissal of a complaint under Rule 12(b)(6). *Vega v. United States*, 881 F.3d 1146, 1152 (9th Cir. 2018). We begin with Park's claims against Naki and Omoso. Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. To state a claim under this provision, Park must allege that she suffered the deprivation of a federally protected right and that "the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The district court properly dismissed Park's claims against Naki and Omoso because, even assuming that their conduct violated Park's Fourteenth Amendment right to bodily integrity, she has not plausibly alleged that the officers committed the deprivation while acting under color of state law.

Our circuit has developed a three-part test for determining when a police officer, although not on duty, has acted under color of state law. The officer must have: (1) acted or pretended to act in the performance of his official duties; (2) invoked his status as a law enforcement officer with the purpose and effect of influencing the behavior of others; and (3) engaged in conduct that "related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Anderson v. Warner*, 451 F.3d 1063, 1068–69 (9th Cir. 2006) (internal quotation marks omitted).

Park's claims against Naki and Omoso fail at the first step. The complaint does not plausibly allege that either officer was exercising, or purporting to exercise, his official responsibilities during the events that led to her injuries. Both officers were off-duty and dressed in plain clothes, drinking and socializing at the bar in their capacity as private citizens. They never identified themselves as officers, displayed their badges, or "specifically associated" their actions with their law enforcement duties. *Naffe v. Frey*, 789 F.3d 1030, 1038 (9th Cir. 2015). Thus, even accepting Park's allegations as true, there is no sense in which Naki and Omoso performed or purported to perform their official duties on the night in question.

Park alleges that, although Naki and Omoso were off-duty and present at the bar in their capacity as private citizens, everything changed when they saw Kimura pull out his firearm. According to the complaint, Naki and Omoso became "effectively on-duty" at that moment, as the Honolulu Police Department requires even its off-duty officers to affirmatively protect the community when a dangerous situation arises in their presence. But as our cases make clear, the critical question is not whether the officers were technically on or off duty, but instead whether they exhibited sufficient indicia of state authority for us to conclude that they were acting in an official capacity. *See, e.g.*, *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838–39 (9th Cir. 1996). For instance, in *Van Ort*, we held that an officer did not act under color of state law when he robbed a house that he had searched a few days earlier while on duty. *Id.* at 839–40. We did not rest our decision on the fact that the officer was off-duty when he returned to the house; rather, we emphasized that he was not in uniform, did not identify himself as a policeman, and did not pretend to exercise his official responsibilities in any way. *Id.* at 838–

40.  The same analysis applies here.  Because Naki and Omoso did not act or purport to act in the performance of their official duties, they were not acting under color of state law.  We accordingly affirm the district court's dismissal of Park's claims against Naki and Omoso.

## II

The remaining question is whether Park has plausibly alleged a claim against the County.  A municipality may be held liable as a "person" under 42 U.S.C. § 1983 when it maintains a policy or custom that causes the deprivation of a plaintiff's federally protected rights. *Monell*, 436 U.S. at 694.  To state such a claim, a plaintiff must allege either that (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so"; or (2) the municipality, through inaction, failed to implement adequate policies or procedures to safeguard its community members' federally protected rights.  *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404, 407–08 (1997); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).  When, as here, a plaintiff pursues liability based on a failure to act, she must allege that the municipality exhibited deliberate indifference to the violation of her federally protected rights. *Tsao*, 698 F.3d at 1143.  We agree with the district court that Park's *Monell* claim must be dismissed because she has not plausibly alleged that the County's inaction reflected deliberate indifference to her Fourteenth Amendment right to bodily integrity.[1]

---

[1] To hold a municipality liable for its inaction, a plaintiff must allege that a municipal employee violated her federally protected rights while acting under color of state law. *See Gibson v. County of Washoe*, 290

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. Deliberate indifference exists when the need "for more or different" action "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989). A plaintiff can meet this standard in one of two ways. In some circumstances, the policy may be so facially deficient that any reasonable policymaker would recognize the need to take action. *Brown*, 520 U.S. at 409. When that is the case, a plaintiff need point only to the policy itself to establish that the municipality's policymakers were on notice that the plaintiff's federally protected rights would likely be violated if they failed to act. *See id.* Alternatively, if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice. *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010), *overruled on other grounds by Castro*, 883 F.3d at 1070.

Park premises her claim against the County on the failure of the relevant policymaker—here, the Chief of Police—to address deficiencies in the two Honolulu Police Department

---

F.3d 1175, 1194 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc); *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998). For purposes of this analysis, we assume that Kimura was acting under color of state law when he attempted to load his firearm and that his conduct violated Park's Fourteenth Amendment right to bodily integrity.

policies or customs mentioned earlier.  As to Policy 2.38, Park contends that the Chief of Police failed to amend the policy to prohibit officers from carrying firearms whenever they consumed alcohol in any amount.  As to the "brotherhood culture of silence," Park alleges that the Chief of Police failed to implement mandatory whistleblowing policies, which would have rooted out the culture of silence. Even accepting those allegations as true, Park has not plausibly alleged that the Chief of Police had actual or constructive notice that his inaction would likely result in the deprivation of her federally protected rights.

Park's allegations concerning Policy 2.38 assert that the policy's facial deficiencies were so obvious that any reasonable policymaker would have recognized the need for reform.  As Park reads the policy, it required off-duty officers to carry a firearm while consuming alcohol up until the point of impairment—a situation that would almost certainly endanger the safety of anyone in the officer's immediate surroundings.  We do not think that the policy can sensibly be read in that way.[2]  First, the policy required that officers possess *holstered* pistols, which does not encompass taking out a firearm when doing so is unnecessary.  Second,

---

[2] The policy states in relevant part:

> All officers . . . shall be in possession of the . . . holstered pistol . . . at all times unless otherwise specified by directive, law, or the situation below:

> Police officers whose physical and/or mental processes are impaired because of consumption or use of alcohol, medication, or any other substance which could impair a person's physical or mental processes, are prohibited from carrying firearms while in such an impaired condition.

the policy's explicit purpose was to *prohibit* officers from carrying firearms while in an impaired condition. It in no way directed off-duty officers like Kimura to carry their firearms with them when going to a bar to drink—an activity that could obviously result in one's "physical and/or mental processes" becoming impaired "because of consumption or use of alcohol." Even if Kimura somehow interpreted the policy to require such action, it is far from obvious that any reasonable officer would have interpreted the policy in that fashion. Thus, Park has not plausibly alleged that this is a situation in which "the need for more or different" action was "so obvious" that we can infer deliberate indifference from the text of the policy alone. *City of Canton*, 489 U.S. at 390.

Park has not plausibly alleged that the Chief of Police was aware of prior, similar incidents in which off-duty officers mishandled their firearms while drinking. In her complaint, she alleges only that, on two prior occasions, she witnessed Kimura drunkenly brandish his firearm in the presence of Naki and Omoso while drinking at the bar. As Park acknowledges, however, the Chief of Police did not learn of those incidents before her injury, and she alleges no other prior incidents that would have alerted the Chief of Police that officers were interpreting Policy 2.38 to require conduct that endangered members of the public. Instead, she asserts that the Chief of Police knew or should have known of Policy 2.38's foreseeable consequences because the Honolulu Police Department referenced on its website a Hawaii statute prohibiting individuals with alcohol-abuse disorders from possessing firearms. That allegation falls far short of establishing deliberate indifference.

Park's allegations concerning the "brotherhood culture of silence" fare no better. Park asserts that the Chief of

Police had actual notice of the foreseeable consequences of his inaction because he knew about three prior instances in which officers attempted to conceal each other's misconduct. But Park offers no details about the type of misconduct allegedly committed by these officers or the extent to which their actions implicated community members' federally protected rights. Without *any* information about the nature of the prior incidents, we cannot reasonably infer that the Chief of Police knew or should have known that the culture of silence would likely result in the deprivation of Park's constitutional rights. For instance, Park does not even allege that those prior incidents involved the deprivation of an individual's federally protected rights, as opposed to more minor transgressions such as the violation of department overtime policies or the misuse of a police vehicle for personal pursuits. Unless the Chief of Police had reason to know that the culture of silence extended to concealment of misconduct involving the deprivation of federally protected rights, he cannot be said to have been deliberately indifferent to a foreseeable risk that Park's own rights would be violated. *See Tsao*, 698 F.3d at 1145.[3]

---

[3] Even if Park had alleged that these prior incidents involved the deprivation of federally protected rights, more would be required to establish deliberate indifference. Park does not describe how the Honolulu Police Department responded to the three incidents or whether the officers involved in the cover-ups faced any repercussions for their behavior. Park alleges only that the Chief of Police knew about the incidents and failed to implement whistleblowing policies. But whether the Chief of Police's failure to implement such policies exhibited deliberate indifference to Park's constitutional rights depends, at least in part, on whether he took other measures to address the officers' misconduct.

Finally, although Park frames Policy 2.38 and the "brotherhood culture of silence" as separate theories of liability, we do not think that she can salvage her claim by combining the two sets of allegations. Park asserts that the Chief of Police *would* have known about Kimura's prior incidents of drunkenly brandishing his firearm (and thus *would* have become aware of the deficiencies in Policy 2.38) had he addressed the culture of silence by mandating that officers report their colleagues' transgressions. At most, however, this assertion suggests that Park's injuries could have been avoided if: (1) the Chief of Police had implemented mandatory whistleblowing policies; (2) Naki and Omoso had reported Kimura's behavior pursuant to those policies; and (3) the Chief of Police had taken appropriate steps to deter Kimura from committing such misconduct again in the future. Whether the Chief of Police could have prevented Park's injuries goes to the issue of causation, a separate question from whether his inaction reflected *deliberate indifference* to Park's federally protected rights. The Chief of Police's failure to address the culture of silence could establish his deliberate indifference to the risk posed by Kimura's conduct only if he knew that the culture of silence extended to incidents involving the deprivation of community members' federally protected rights and still turned a blind eye. As just explained, Park's complaint fails to plausibly allege that fundamental premise.

Because Park has not plausibly alleged that the Chief of Police's inaction exhibited deliberate indifference to her federally protected rights, we affirm the district court's dismissal of her § 1983 claim against the County.

**AFFIRMED.**

M. SMITH, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion as applied to Officers Naki and Omoso, and agree that the § 1983 claims against them should be dismissed for failure to plausibly allege that they were acting under color of law. However, I respectfully disagree with the majority's analysis of Park's *Monell* claim against the County.

## I.   Officer Kimura

The majority assumes for purposes of its *Monell* analysis that Park plausibly alleges that Officer Kimura acted under color of law and violated Park's Fourteenth Amendment right to bodily integrity. Because I would find that Park has also plausibly alleged deliberate indifference on the part of the County, as discussed below, it is necessary for me to explain why I think the majority's assumption about Officer Kimura indeed reflects the correct legal result.

The facts alleged in Park's Second Amended Complaint (SAC) plausibly demonstrate that Officer Kimura was acting under color of law in two respects. First, "a state employee who . . . exercises his official responsibilities in an off-duty encounter, typically acts under color of state law." *Naffe v. Frey*, 789 F.3d 1030, 1037 (9th Cir. 2015). Park alleges that Officer Kimura's purpose for handling his firearm at the time of the shooting was to exercise his official responsibilities. Specifically, Honolulu Police Department (HPD) Policy No. 2.38 required HPD officers to carry a pistol at all times, even when not scheduled for work, except when "impaired" by alcohol. Park alleges that Officer Kimura was carrying and attempted to reload his revolver that night for purposes of compliance with HPD Policy No. 2.38.

This is "typically" enough to find action under color of law, and I see no reason to stray from the general rule here. *Id.* at 1037. It is irrelevant that Officer Kimura technically violated HPD Policy No. 2.38 by possessing his firearm while impaired by alcohol. *See Screws v. United States*, 325 U.S. 91, 111 (1945) ("Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."). Defendants do not offer a counter-explanation for Officer Kimura's firearm handling, let alone one "so convincing" as to make Park's explanation "*im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

The color of law test we articulated in *Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006), fits poorly in the circumstances here. We developed the second prong of that test—"the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others," *id.* at 1069—to address circumstances in which an off-duty officer was neither exercising nor even attempting to exercise his official duties. *See id.* at 1065–66 (off-duty county jail custodial officer assaulted plaintiff after plaintiff accidentally rear-ended officer's personal truck); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 833–34 (9th Cir. 1996) (off-duty sheriff's deputy attempted to rob plaintiffs at gunpoint); *Naffe*, 789 F.3d at 1033 (off-duty county prosecutor published derogatory statements about plaintiff on prosecutor's personal blog and Twitter). As alleged in the SAC, Officer Kimura was similarly off duty but *was* attempting to exercise his official duties, his failure to properly heed HPD's impairment policy notwithstanding. I do not believe we need look for a purpose of invoking official status to influence others when we have the more direct purpose of exercising official duties for official ends. *See Naffe*, 789 F.3d at 1037 (distinguishing

cases involving "a state employee who . . . exercises his official responsibilities in an off-duty encounter," from "[a] state employee who is [entirely] off duty," and applying the *Anderson* test only to the latter).  As we acknowledged in *Anderson*, "[t]here is no 'rigid formula' for determining whether a state or local law official is acting under color of state law."  451 F.3d at 1068 (quoting *Ouzts v. Md. Nat'l Ins. Co.*, 505 F.2d 547, 550 (9th Cir. 1974) (en banc)).

Based on this analysis, Park plausibly alleges that Officer Kimura handled his revolver on the night in question for HPD reasons, not personal reasons.  Construing the facts in Park's favor, Officer Kimura therefore acted under color of law.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Naffe*, 789 F.3d at 1037.

Second, even if we were to apply the *Anderson* test, it is satisfied when we consider Park's allegations regarding Officer Kimura's prior conduct.  The law of our circuit does not per se proscribe consideration of prior conduct.  I would find that the prior conduct alleged here bears a sufficient nexus to the conduct on the night of the shooting to include it within the scope of our color of law analysis.

On Park's alleged facts, Officer Kimura plausibly "pretend[ed] to act under color of law" on previous occasions by flaunting his officer status, as well as by brandishing his firearm.  *Naffe*, 789 F.3d at 1037.  His pretense plausibly had the "purpose and effect of influencing the behavior of" Park so that she would tolerate his dangerous and drunken misbehavior at her bar, whenever he appeared.  *Id.*  He did not need to assert his officer status on every occasion in order to have this effect; asserting it regularly served the purpose well enough.  The harm he inflicted on Plaintiff "related in some meaningful way" to his officer status, *id.*, in that he "used 'the badge of [his]

authority'" to ensure his impaired firearm handling would be tolerated, *Anderson*, 451 F.3d at 1069 (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)). If he had not had the protection of purported state authority, he would likely have been banned from the bar or indeed arrested for his conduct.[1] And Park would not have ended up shot.[2]

Our decision in *Huffman v. County of Los Angeles*, 147 F.3d 1054 (9th Cir. 1998), though facially similar, is distinguishable. *See id.* at 1058 (plainclothes, off-duty police officer did not act under color of state law when he inadvertently shot opponent during bar brawl). First, the officer in *Huffman* had a personal purpose for handling his firearm, namely securing his loose gun during a personal brawl. *See id.* at 1056. By contrast, Officer Kimura

---

[1] Hawaii law allows open carry of a loaded handgun only with a license, which an applicant can obtain "only '[w]here the urgency or the need has been sufficiently indicated' and the applicant 'is engaged in the protection of life and property.'" *Young v. Hawaii*, 896 F.3d 1044, 1048 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019) (quoting H.R.S. § 134-9).

[2] The Fourth Circuit's reasoning in *Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003), is persuasive. In that case, off-duty deputy sheriffs went to various stores to buy out all copies of a newspaper that criticized their department. *Id.* at 520. The officers were out of uniform, not wearing badges, and using their personal vehicles. *Id.* They were, however, "carrying their state-issued firearms, and some of those firearms were visible during the evening." *Id.* at 526. The Fourth Circuit highlighted the fact that, despite being out of uniform and making no overt threats, the officers "were recognized as police officers by store employees throughout the county," and, according to one store clerk, "basically came off real intimidating." *Id.* Since "[p]roprietors of small stores often feel a keen need to stay on the right side of local law enforcement," the Fourth Circuit found that the officers' "status as sheriff's deputies enabled them to execute their scheme in a manner that private citizens never could have." *Id.*

plausibly had an official purpose for handling his firearm. *Cf. McDade*, 223 F.3d at 1141 (distinguishing *Huffman* because the county employee in *McDade* was "committ[ing] an act that was related to her official duties"). Second, the officer in *Huffman* not only "never identified himself as a sheriff's deputy on the evening of the shooting," *id.* at 1058, but he also attempted to disguise his status by telling the victim he "owned an air conditioning company," *id.* at 1056. Officer Kimura made no attempt to disguise his officer status, and indeed had engaged in a pattern of behavior designed to ensure his officer status would be recognized, and respected, whether he asserted it or not. *Cf. McDade*, 223 F.3d at 1141 (distinguishing *Huffman* because the county employee in *McDade* acted under pretense of state authority by entering her state passcode into a database of private information).[3]

Our decision in *Van Ort* is also distinguishable. *See* 92 F.3d at 838–39 (off-duty police officer did not act under color of state law when he tortured and attempted to rob the residents of a home he had previously entered while on duty). As in *Huffman*, the officer in *Van Ort* had a personal purpose for handling his firearm, in this case robbing his victims at gunpoint. *See id.* at 834. As in *Huffman*, the

---

[3] In *McDade*, we considered a § 1983 lawsuit against a clerical employee at a county District Attorney's office. 223 F.3d at 1137. The employee had used her official access to a state medical database to locate her husband's ex-wife at a battered women's shelter. *Id.* The employee's purpose was to enable her husband to serve papers on his ex-wife relating to child custody issues. *Id.* We held that the employee acted under color of law, despite being engaged in a purely personal pursuit, because she "acted under the pretense of state employment by asserting her state-authorized passcode to enter into the database." *Id.* at 1141. Notably, we did not rely on the fact that the employee accessed the database during her scheduled work hours.

officer in *Van Ort* attempted to disguise his official status during his crime. *See id.* at 838–39; *cf. McDade*, 223 F.3d at 1141 (distinguishing *Van Ort* for the same reasons as *Huffman*). Thus, it was not enough in *Van Ort* that the victim alleged he recognized the officer on account of a previous on-duty visit, because the officer "did not use his authority to gain entry to the home or to induce [the victim] to open his front door," nor did the officer "purport to be acting as a policeman." *Id.* at 839. By contrast, Officer Kimura's identity as an officer was not just incidentally recognized by Park. Officer Kimura ensured Park would recognize his officer status by regularly flaunting it and by demonstrating his authority to wield a weapon in her bar without consequence.

Thus, contrary to the County's arguments, I conclude that prior conduct *is* potentially relevant to our under color of law analysis, and is in fact dispositive in this case. On the facts plausibly alleged in the SAC, I have no doubt that Officer Kimura's drunken wielding of his revolver in a bar full of people was an abuse of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Naffe*, 789 F.3d at 1036 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Thus, I believe that the majority's assumption that Officer Kimura acted under color of law in fact reflects the correct result. I therefore also have no doubt that Park has plausibly alleged a Fourteenth Amendment violation of her right to bodily integrity, given the plausible allegation of a state actor, and of deliberate indifference by the County as I

discuss below.[4]  *See P.B. v. Koch*, 96 F.3d 1298, 1302–04 (9th Cir. 1996).

## II. *Monell* Liability

Contrary to the majority, I would find that the facts in the SAC plausibly give rise to § 1983 liability for the County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), on the basis of the County's role in causing Officer Kimura's actions.  To state a *Monell* claim, a plaintiff must allege "that the government 'had a deliberate policy, custom, or practice that was the "moving force" behind the constitutional violation.'"  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (quoting *Galen v. Cty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007)).  In addition, the plaintiff must demonstrate that the municipality acted with "deliberate indifference" to her constitutional rights.  *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc).

The "moving force" showing requires both causation-in-fact and proximate causation.  *Gravelet-Blondin*, 728 F.3d at 1096.  To demonstrate causation-in-fact, a plaintiff must plausibly "establish 'that the injury would have been

---

[4] Park likely alleges a plausible Fourteenth Amendment violation by Officer Kimura himself, in terms of unconstitutionally excessive use of force—it was likely "objectively unreasonable" for Officer Kimura to wield (or attempt to reload) his gun while drunk in a bar full of people. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122–24 (9th Cir. 2018). *Cf. Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc) (merely pointing a gun may constitute Fourteenth Amendment excessive force).  But this is unnecessary to resolve for *Monell* purposes. *See, e.g.*, *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc) ("[A] municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates.").

avoided' had proper policies been implemented." *Long v. Cty. of L.A.*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quoting *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1196 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d at 1076). Park points to many policy corrections that plausibly would have prevented her injuries, including a prohibition on firearm possession while consuming alcohol in any amount, guidance regarding assessing impairment and preventing firearm misuse by impaired officers, mandatory reporting of officer misconduct, and whistleblower protections for reporting officers. I would reject Defendants' suggestion that a policy prohibiting firearm carrying while "drinking" would have been just as ineffective as the actual policy—prohibiting firearm carrying while "impaired"—because "impairment starts with the first sip." Most people do not consider themselves impaired after "one sip." Similarly, I disagree with the majority's conclusion that HPD Policy No. 2.38 did not require HPD officers to carry their firearms with them to a bar. It is unclear when exactly the majority reads the policy to direct (or even permit) officers to dispossess themselves of their holstered pistols in relation to a plan to drink at a bar, nor is it clear what the officers should then do with the pistol. Officers who fail to carry their pistol while at a bar but not impaired would violate the policy's plain terms. Officers who become impaired while carrying a holstered pistol are dangerous.

To demonstrate proximate causation, a plaintiff must plausibly establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort*, 92 F.3d at 837 (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)). Park plausibly alleges that HPD Policy No. 2.38 created a foreseeable risk that an officer would carry his gun while drinking; that HPD's

"brotherhood culture of silence" created the foreseeable risk that he would not be reported if he then misused his gun while drinking; and that the lack of reporting created the foreseeable risk that his misuse would continue until he accidentally shot someone.[5]   Accordingly, Park plausibly alleges that HPD's policies were the "moving force" behind her injuries.

The "deliberate indifference" inquiry is an objective one, concerning whether the need for different policies or procedures was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the municipality "can reasonably be said to have been deliberately indifferent to the need." *Castro*, 833 F.3d at 1076.   The set of inferences just described as plausibly demonstrating foreseeability for purposes of proximate causation also plausibly demonstrate "obvious[ness]" for purposes of deliberate indifference.[6]  *Id.*

---

[5] *Huffman* is again distinguishable.  *See* 147 F.3d at 1061 (policy requiring deputies to carry guns at all times, without warning about dangers of carrying guns while intoxicated, albeit "bad policy," was not the proximate cause of shooting because "County could not have foreseen [officer's] actions").  In *Huffman*, the officer was not acting under color of law, the bar brawl was an unforeseeable intervening event between carrying a gun while drinking and the act of discharging the gun, and the department had no knowledge of—nor was there any allegation of—past incidents involving the defendant officer. *See id.* at 1060.

[6] Three recent district court decisions—each of which allowed a similar *Monell* claim to go forward even when the relevant officer was not acting under color of law—are persuasive regarding the foreseeability and obviousness here:

A municipality must also have had "actual *or constructive notice*" of the substantial certainty of a constitutional violation, which likewise invites an objective inquiry. *Id.* (emphasis in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and dissenting in part)). I disagree with the majority's conclusion that Park has failed to plausibly allege that the County had notice here. Officer Kimura's repeated engagement in drunken and dangerous weapons handling occurred in the presence of other HPD officers. This put the County on at least "constructive" notice of the substantial risk of harm, whether on account of its policies generally or on account of its policies' effects on Officer

---

In *Wagner v. Cook County Sheriff's Office*, 378 F. Supp. 3d 713 (N.D. Ill. 2019), the district court allowed a *Monell* claim against the county where an intoxicated off-duty officer, not acting under color of law, physically attacked and held a knife to the head of a bartender. *Id.* at 714–15. The plaintiff alleged that the officer had a history of misconduct involving excessive force and intoxication, and that the county had a policy or custom of insufficiently investigating or disciplining its officers. *Id.* at 714.

In *Falcon v. City of Chicago*, No. 17-C-5991, 2018 WL 2716286 (N.D. Ill. June 6, 2018), an intoxicated off-duty police officer, not acting under color of law, accidentally discharged her gun at her friend's home and killed her friend. *Id.* at *1, *3. The district court allowed a *Monell* claim against the city for failure to properly train officers and failure to adequately enforce its regulations regarding the handling of guns while drinking. *Id.* at *6.

And in *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017), an intoxicated off-duty officer's friend suffered a paralyzing bullet wound from the officer's gun, either after the friend shot himself in an attempted suicide or after the officer shot him. *Id.* at 974. The district court found that fact issues precluded summary judgment for the city on the friend's *Monell* claim premised on the city's "code of silence" and failure to discipline officers for misconduct. *Id.* at 991–93.

Kimura specifically. I certainly would not shield the County from being charged with "constructive notice" of Officer Kimura's past behavior where the very reason individual policymakers may not have had "actual" notice was the offending brotherhood culture of silence. To the extent that the majority identifies additional facts that, if alleged, would have made out a more compelling case for constructive or actual notice, Park should be given leave to amend.

For the foregoing reasons, I respectfully dissent as to the dismissal of Park's *Monell* claims against the County. I would reverse the district court and allow that portion of Park's lawsuit to proceed.